JAMES F. McKAY III, Judge.
hln Ulysses Hill’s second appeal to this Court, he seeks to overturn his conviction and sentence for second degree murder, alleging that the trial court erred by denying his motion for new trial and his motion for post-verdict judgment of acquittal. The defendant’s claims have no merit. Accordingly, we affirm his conviction and sentence.
STATEMENT OF CASE
On September 30, 2004, the grand jury returned an indictment charging Ulysses Hill with the second degree murder of Nolan Fields,[1] a charge to which he subsequently pled not guilty. On March 15, 2005, at the conclusion of a two-day trial, a twelve-person jury found him guilty as charged. Mr. Hill moved for a new trial. New counsel enrolled, and counsel filed a combined motion for new trial and motion for post-verdict judgment of acquittal. The court granted the motion for new trial on October 24, 2006. The State sought review, and in an unpublished disposition, this Court reversed the trial court’s ruling, reinstated Mr. Hill’s conviction, and remanded the case for sentencing. State v. Hill, unpub., 2006 (La.App. 4 Cir. 2/21/07). On April 13, 2007, the court sentenced Hill to life imprisonment without *896 benefit of parole, probation, or suspension of sentence. On appeal, this Court affirmed Hill’s conviction, vacated his sentence, and remanded the case for rulings on a portion of his motion for new trial and on his motions for post-verdict judgment of acquittal and to reconsider sentence. State v. Hill, unpub., 2009-0469 (La.App. 4 Cir. 12/9/09), 25 So.3d 1035. The Supreme Court denied writs. State v. Hill, 2010-0033 (La.10/1/10), 45 So.3d 1093.
On remand, the trial court denied the motion for new trial and the motion for post-verdict judgment of acquittal on March 23, 2011. The court again sentenced Mr. Hill to life imprisonment without benefit of parole, probation, or suspension of sentence. The court also granted Mr. Hill’s motion for appeal and denied his motion for reconsideration of his sentence. FACTS
The fact summary is taken from the Ulysses Hill’s prior appeal:
A few minutes before 4:00 on the afternoon of July 18, 2004, Nolan Fields was shot to death in the St. Bernard Housing Project. An autopsy revealed that Fields sustained four gunshot wounds, two of which would have been fatal, as well as a grazing wound. The forensic pathologist who performed the autopsy retrieved four bullets from Fields’ body, which when they were later tested, revealed that they had been fired from the same gun. Because of the lack of gunpowder residue on Nolan’s body, the pathologist testified that the shots were fired from some distance from the victim. Bodily fluids taken from Nolan’s body tested negative for alcohol or other commonly-abused drugs.
Pursuant to various 911 calls, Off. Robert Monlyn and his partner responded to the shooting. In the 3900 block of Duplessis Street, they discovered Fields’ body lying on the concrete. Fields was still alive, and EMS personnel transported him to a hospital. Off. Monlyn testified that at some point he received information indicating that a blue, two-door Thunderbird with a “K” |3in its license plate was involved in the shooting. On cross-examination, Off. Monlyn stated that he and his partner did not interview any witnesses on the scene because it was his experience that no witnesses to the shooting in that area would come forward. He stated that Anna Fields, the victim’s sister, identified the victim on the scene. Off. Monlyn’s self-described role in the murder investigation was limited to maintaining the scene until crime lab personnel and the investigating officer arrived.
Detective James Kelly was the lead investigator on the case. Rather than respond to the scene of the shooting, he went to the hospital where the victim had been taken. Once there, however, he learned the victim had died. He spoke with the victim’s family and learned from his sister that the defendant, Hill, was a suspect in the shooting. He stated, however, that Ms. Fields was not a witness to the shooting. She also told him that another man was walking with her brother when her brother was shot, but Det. Kelly was never able to contact this man. Det. Kelly got a call from another officer who told him that a car suspected to be involved in the shooting had been located. Det. Kelly described the car as a black Thunderbird with a “KW” or “KM” on its license plate. Det. Kelly went to the 3600 block of Hamburg Street, in the St. Bernard Housing Project, and found the car parked on the street. The owner of the car, Hill’s sister Loretta Hill, who lived in the apartment complex in front of which the car was parked, soon came downstairs to ask why the officers were around her car. When he told her that the car was implicated in a shooting in *897 the project, Ms. Hill stated that no one other than herself had driven the car, and she denied any knowledge of the shooting.
Det. Kelly testified that Ms. Hill stated that she had recently returned home from work and had driven through the area of the shooting, but she had not seen anyone outside at the time. She stated that she then went to pick up her boyfriend from work. She estimated that she picked up her boyfriend at around 8:15 p.m., and then the two went to her apartment. Det. Kelly later spoke with Ms. Hill’s boyfriend, who told him that Ms. Hill picked him up around 4:30 p.m. Ms. Hill consented to a search of her car, but no evidence was seized from the car. She then agreed to go the police station, where she gave a statement.
|4The next day, Det. Kelly received a call from the victim’s cousin, who indicated that she knew someone who wanted to speak to him about the shooting. He then met with Troy Lynn Solomon, who gave him information about the shooting. Ms. Solomon also gave a statement to the police. Based on this information, he obtained an arrest warrant for Hill and an arrest warrant for Loretta Hill.
On cross-examination, defense counsel questioned Det. Kelly in great detail about whether the information about the dark blue Thunderbird was contained in the 911 calls to the police. After some miscommunication on both parts, Det. Kelly ultimately testified that he received this information in a call from his sergeant, who had gotten the information from some other source that Det. Kelly did not know. He also testified that the police report indicated that although Ms. Fields identified the victim on the scene, she did not tell the responding officers that Ulysses Hill was a suspect in the shooting. Det. Kelly stated that Ms. Hill was not a suspect at the time she gave her statement at the police station. He admitted that although the officer who interviewed Ms. Hill at the police station took notes while she gave her statement, he threw away these notes after incorporating the statement into his police report.
Det. Kelly also indicated that the police received Crimestopper tips that corroborated the information they received from Ms. Troy Lynn Solomon, the only eyewitness to the shooting, who identified Hill. Ms. Solomon admitted that she had a prior conviction for passing worthless checks. She testified that she lived in the 3900 block of Duplessis. She stated that she was sitting on her back porch at approximately 3:00 on the afternoon of July 18, 2004. She saw Hill get out of a silver Malibu with tinted windows and go upstairs in the building next to hers, where Hill’s brother lived. She estimated he was inside for fifteen to twenty minutes. She saw Nolan Fields and a man whom she identified only as “Dwanne” walk into the driveway. Fields was on his way to her apartment to get some keys. She also saw a black or dark blue car she described as a Monte Carlo drive into the driveway and park. She saw Hill emerge from the building next door, and he and the victim began talking and then arguing for five to ten minutes. She heard Hill accuse Fields of putting mud in Hill’s gas tank, a charge that Fields denied. She heard Hill tell Fields that next time he would “deal” with him, and |fiFields turned and began walking away. Ms. Solomon testified that she then heard gunshots, even though she did not see a gun because Hill had his back to her. She estimated Hill shot five or six times, and she testified that after the first shot, she saw the *898 appellant standing over Fields while more shots rang out.
Ms. Solomon identified Loretta Hill as the person who drove the dark blue car into the driveway, and Ms. Hill parked the car near the building she had seen Hill enter. , After Ms. Hill turned the car around and parked it, she got out of the car and stood near the driver’s side of the car. Ms. Solomon testified that Ms. Hill would have been able to see Fields and Hill arguing and would have seen the shooting from her vantage point. After Hill shot Fields, Ms. Solomon saw him and Ms. Hill enter the car and drive from the scene. Ms. Solomon positively identified Hill as the man who shot Fields and Ms. Hill as the woman who watched the shooting and who left in the car with Hill after the shooting.
On cross-examination, Ms. Solomon admitted that although she called 911 after the shooting, she did not tell the operator or the officers on the scene that Hill was the perpetrator or that Ms. Hill had helped him escape the scene. Instead, she called the police the next day. She stated that one of her sons and his girlfriend Delana were with her on the porch when the shooting occurred. She also admitted that in her statement she mixed up which street Ms. Hill entered and the one by which she and Hill left the scene. She stated that one of her sons was the victim of a shooting that occurred a few weeks before this shooting, and she believed that two of the Hill brothers knew about the shooting before it happened and could have tried to prevent it. Nonetheless, she insisted that she did not believe the brothers were actually involved in her son’s shooting.
The defense called Delana Humphrey, who testified that she was in the area at the time of the shooting. She saw Loretta Hill pass by in her car and keep going. Ms. Humphrey then walked to the front porch of the building and sat with her daughter and with Ms. Solomon. She heard gunshots, grabbed her daughter, and ran inside Ms. Solomon’s apartment. She denied seeing Hill in the neighborhood that day. Ms. Humphrey admitted that both defendants were her cousins. She also admitted that Ms. Hill drove a dark blue Thunderbird. She insisted that she could not see the | (¡shooting because it occurred around the corner of the building, out of sight from where she was sitting with Ms. Solomon.
Paul Hay testified that he worked with Ms. Hill at the time of the shooting. On the day of the shooting, they got off work around 3:00, and Ms. Hill drove both him and another worker to their homes. He estimated that she dropped him off around 8:35. He did not recall her receiving a cell phone call during the ride to his house.
Chaka Hall testified that she is Hill’s fiancée and Ms. Hill’s “sister-in-law.” She testified that on July 18, she and Hill had planned to attend her family’s reunion, but they decided not to do so because of heavy rain that morning. Instead, they decided to stay home and barbeque at their apartment, which was located across the river from the scene of the shooting. She ran various errands, leaving at 10:00 a.m. and returning around 2:00 p.m., and Hill was at home both when she left and when she returned. She and Hill then went to Wal-Mart, and they returned home after shopping. She identified a sales receipt from Wal-Mart showing that the time of checkout was 2:57 p.m. Nonetheless, she admitted that she paid cash for her purchases, and the receipt contained no name of the purchaser. She insisted that Hill did not leave the apartment after they returned from shopping, nor did anyone drive her car that after *899 noon. She admitted that at the time of the shooting she owned a grey Malibu.
Loretta Hill testified that a neighbor notified her on the evening of July 18, 2004 that police officers were looking at her car, which was parked outside her apartment. When she went to the officers to see why they were interested in her car, they told her that they were investigating a homicide. At the officers’ request, she produced her insurance, driver’s license, and registration papers, and she further allowed the officers to search her car. She told them that the ear could not have been involved in a homicide because she was the only person who drove it that day. She agreed to accompany them to the police station, where she gave a taped statement. The officers asked her if she was Hill’s sister, and she stated that she was, but she denied seeing him that day.
Ms. Hill produced her timesheet from work that showed that she got off work at 3:09 p.m. that afternoon. She drove two co-workers home before going to her own |7apartment. She drove home through the project and saw Ms. Solomon and Ms. Humphrey sitting on Ms. Solomon’s porch. She denied parking her car there, insisting that she kept driving toward her apartment. She denied seeing either her brother or Nolan Fields when she drove through the area prior to the shooting. When she got to her driveway, her boyfriend called to ask her to pick him up from work. She picked him up in the French Quarter at approximately 4:30 that afternoon. She denied telling the police she picked up her boyfriend at 3:15, not 4:30.
On rebuttal, the State recalled Det. Kelly, who testified that the police did not take a taped statement from Ms. Hill. He reiterated that Ms. Hill told him that she picked up her boyfriend at 3:15, not 4:30.
State v. Hill, unpub., 2009-0469 (La.App. 4 Cir. 12/9/09), 25 So.3d 1035.
DISCUSSION/ASSIGNMENTS OF ERROR
By his first assignment of error, Ulysses Hill contends that the trial court erred by not recognizing that it initially granted the new trial pursuant to the “ends of justice” ground for a new trial as set forth in La.C.Cr.P. art. 851(5).[2] He argues that because the court initially granted the motion, and nothing changed in the case between its initial ruling granting the motion in 2006 and its denial on remand in 2011, the court should have granted the motion, deeming its 2006 ruling to have been in the “ends of justice.” He then re-urges the same grounds that he urged in 2006. This claim has no merit for several reasons.
1¡¡After conviction, but before withdrawing as counsel, trial counsel filed a motion for new trial wherein he alleged that the *900 defendant was deprived of a fair trial on two grounds. He first alleged that the State improperly misrepresented that it filed discovery motions seeking information concerning any alibi witnesses. He argues that by relying on this assertion, the court prevented the defense counsel from mentioning the alibi witness in his opening statement, and admonished counsel when he told the jury that there would be evidence to show where the defendant was at the time of the murder. He asserted that by the time that the State admitted that it did not seek this information, and the court changed its mind about allowing the defense to present alibi evidence, he had been deprived of a fair trial. His second claim concerned the court’s jury instruction on inconsistent statements, particularly as it applied to the State’s alleged eyewitness. Counsel did not allege that the new trial should have been granted pursuant to La.C.Cr.P. art. 851(5), which states in pertinent part: “the court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right”.
After trial counsel withdrew, present counsel enrolled and filed a combined motion for new trial/motion for post-verdict judgment of acquittal. In this combined motion, the appellant raised three main claims: (1) trial counsel labored under a conflict of interest because he represented both the appellant and his codefendant; (2) trial counsel was ineffective because of various errors he committed during trial, including errors as to presenting alibi evidence and his failure to object to comments made during the State’s closing argument; and (3) the jury’s verdict was contrary to the law and evidence. Again, there was no allegation that a new trial should be granted pursuant to subsection (5) of art. 851.
1 flContrary to the defendant’s present contention, he did not argue at either the October 24, 2006 hearing on the motions or at the March 23, 2011 hearing on remand that a new trial should be granted on this ground. Instead, at the earlier hearing, counsel argued briefly as to the claims raised in his motion (the second, combined motion). In addition, a reading of the court’s ruling shows that it did not grant the new trial on the ground of the “ends of justice.” Instead, as quoted by the defendant in his present brief, the court stated that the defendant “did not receive the best representation during the course of this trial. So I’m going to grant that motion for new trial.” The court granted the motion on a claim of ineffective assistance of counsel, not that the “ends of justice” entitled the defendant to a new trial. At the 2011 hearing, counsel did not present any argument pertinent to this issue.
In addition, in the defendant’s prior appeal, this Court vacated the sentence and remanded the case for the trial court’s ruling on the outstanding motion for post-verdict judgment of acquittal as well as for a ruling on the motion for new trial, filed by trial counsel, which contained allegations not raised in the motion filed by present counsel, and on the motion to reconsider sentence. See State v. Hill, unpub., 2009-0469 (La.App. 4 Cir. 12/9/09), 25 So.3d 1035. Thus, the only grounds that the trial court could consider on remand were those contained in the first motion for new trial. The first motion did not contain an allegation that a new trial should be granted pursuant to subsection (5).
Moreover, the court could not reconsider the claims it had already ruled upon because this Court reversed the trial court’s ruling that granted the motion for new trial. The defendant raised no new argu *901 ment as to these claims after remand. As noted in the State’s brief, this Court should not reconsider its ruling due to the 110“law of the case” doctrine. This Court recently discussed this doctrine in State v. Cox, 2011-0670, p. 6 (La.App. 4 Cir. 2/22/12), 85 So.3d 252, 256:
The “law of the case” doctrine is well-settled; when it is applied and the reasons for it were explained in State v. McElveen, 2010-0172, p. 13, fn. 8 (La.App. 4 Cir. 9/28/11), 73 So.3d 1033, 1054:
The “law of the case” doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. See Pumphrey v. City of New Orleans, 2005-0979 (La.4/4/06), 925 So.2d 1202. This policy applies to parties who were parties to the case when the former decision was rendered and who thus had their day in court. The reasons for the “law of the case” doctrine is to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Day v. Campbell-Grosjean Roofing and Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971). This doctrine is not an inflexible law; thus appellate courts are not absolutely bound thereby and may exercise discretion in application of the doctrine. It should not be applied where it would accomplish an obvious injustice or where the former appellate decision was manifestly erroneous.
See also State v. Scoggins, 2010-0869, p. 19 (La.App. 4 Cir. 6/17/11), 70 So.3d 145, 156.
In Cox, the trial court granted the defendant’s motion to suppress. The State took writs, and this Court reversed the trial court’s ruling. On remand, the defendant withdrew his not guilty plea and pled guilty under Crosby, reserving his right to appeal the denial of his motion to suppress the evidence. No new testimony was taken, nor were any new arguments or pleadings filed. On appeal, this Court |n applied the “law of the case” and refused to revisit the issue of the suppression of the evidence.
In McElveen, from which this Court quoted in Cox, the defendants argued that the trial court erred by excluding evidence that the defendants contended would impeach the credibility of a State’s witness. This Court refused to consider the argument, noting that it had already ruled on the matter in a pretrial writ from the State, and the defendants had presented no new evidence to show that this Court’s earlier ruling was in error. Likewise, in Scoggins, also cited in Cox, the defendant alleged that the trial court erred by allowing and then limiting testimony in violation of the “clergyman’s privilege.” This Court refused to reconsider the claim, noting that it had been considered both by this Court and the Supreme Court, and the defendant had not presented any new evidence to convince this Court that it erred in its earlier ruling.
Here, contrary to counsel’s claim, he did not argue that the new trial should have been granted in the “ends of justice.” He offered nothing new, and’ the trial court could not reconsider its rulings on the grounds alleged in the second motion for new trial. In his brief, counsel essentially re-argues the same grounds that this Court rejected in the earlier writ which found that he was not entitled to a new trial. There is nothing upon which this Court could reconsider its earlier ruling.
Finally, even if the defendant had raised the ground that the court should grant a new trial in the “ends of justice,” *902 and the court granted the motion on that basis, this Court could review the trial court’s decision because such decision presents a question of law that an appellate court can review. See State v. Guillory, 2010-1231 (La.10/8/10), 45 So.3d 612. Because this Court already found that there was no basis to grant the motion for new trial based upon the 1 ^grounds alleged in present counsel’s motion for new trial, it would be justified in reversing any ruling by the trial court that granted relief again on these grounds. For all of the above reasons, this claim has no merit.
By the defendant’s remaining assignments of error, he contends that the evidence adduced at trial was insufficient to support his conviction.[3] He acknowledges that this Court considered and rejected this argument in his prior appeal, but he raises it again merely to preserve his “ability to perhaps raise issues in the future.” As in his first appeal, Ulysses Hill argues that the evidence was insufficient to prove that he was the shooter. As this Court found in his original appeal, this claim has no merit.
CONCLUSION
Ulysses Hill’s arguments concerning the denial of his motion for new trial and of his motion for post-verdict judgment of acquittal have no merit. Accordingly, based on the above and foregoing we affirm his conviction and sentence.
AFFIRMED

. The indictment also charged Loretta Hill with accessory after the fact to the second degree murder of Fields. A jury found her guilty as charged, and the court suspended her five-year sentence at hard labor and placed her on probation for four and a half years. She is not a party to this appeal.

. La.C.Cr.P. art. 851 provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

. In assignment two, he alleges that the evidence was insufficient; in assignment three, he alleges that the trial court erred by denying his motion for post-verdict judgment of acquittal; in assignment four, he contends that the trial court should have granted his motion for new trial, apparently because the evidence was contrary to the law and evidence.